**ELSAG BAILEY, INC., d/b/a Bailey Controls Co., Plaintiff,**

v.

**CITY OF DETROIT, MICHIGAN, Thomas J. Deriemaker, and Westin Engineering, Inc., Defendants,**

and

**CITY OF DETROIT, MICHIGAN, Third–Party Plaintiff/Counter–Plaintiff,**

v.

**AMERICAN HOME ASSURANCE COMPANY, a foreign corporation, Third–Party Defendant.**

No. 96–70623.

United States District Court,
E.D. Michigan,
Southern Division.

June 17, 1997.

Jeffrey G. Heuer, Jaffe, Raitt, Heuer & Weiss, Detroit, MI, Steven G. Feirson, Aaron

C.F. Finkbiner, III, Dechert Price & Rhoads, Philadelphia, PA, for Plaintiff.

Thomas M. Keranen, Walter J. Federlein, Peter J. Cavanaugh, Federlein & Keranen, P.C., Bloomfield Hills, MI, for Defendants City of Detroit and DeRiemaker.

Michael L. Harrison, Harrison & Kaylor, San Jose, CA (Kevin J. Gleeson, Thomas L. Auth, Jr., Sullivan, Ward & Bone, Southfield, MI, of Counsel), for Defendant Westin.

## OPINION AND ORDER AS TO DEFENDANTS' MOTION TO DISMISS (Fed.R.Civ.P.12(b)(6))

FEIKENS, District Judge.

### I. *Jurisdiction*

Jurisdiction in this case is based on diversity of citizenship; the parties are completely diverse and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. Application of Michigan law to the facts is required. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

### II. *Holding*

In this opinion I hold that the doctrine of governmental immunity [1] bars plaintiff Elsag Bailey's (Bailey) common law tort claims against defendant City of Detroit (the City).[2] I note that the City's motion, brought pursuant to Fed. R.Civ. P.12(b)(6), as it relates to Bailey's allegations of common law tort claims, is based on Michigan's governmental liability statute, M.C.L. § 691.1401, *et seq.* I also note that the City does raise as a ground for dismissal that the contract between it and Bailey imposes no common law duties in urging dismissal of the claims of Bailey against Thomas J. DeRiemaker (DeRiemaker), Stephen F. Gorden (Gorden), and Awni G. Qaqish (Qaqish). This aspect of the City's motion will be dealt with hereinafter, as will defendant Westin Engineering, Inc.'s (Westin) motion.

### III. *Background*

Before me are disputes as to the negotiation, performance and breach of contract, PC–665, between Bailey and the City. These disputes prompted Bailey to file this suit. In addition to allegations of breach of contract, Bailey also contends that the City committed both constitutional and common law torts.

This opinion addresses the issue whether Michigan's governmental liability statute, M.C.L. § 691.1401 *et seq.,* bars Bailey's alleged common law tort claims.

The contract, PC–665, dated December 4, 1992, between the City and Bailey, relates to work on a massive renovation and upgrading of the Detroit Water and Sewerage Department's ("DWSD") instrumentation, control,

---

**1.** *See* M.C.L. § 691.1401, *et seq.*

**2.** The Detroit Water and Sewerage Department is a city department, mandated by the Charter of the City of Detroit. The Charter provides at Chapter 15, WATER AND SEWERAGE *:

*Sec. 7–1501. Department*
The water and sewerage department is headed by a seven (7) member board known as the board of water commissioners....

The board shall appoint, with the approval of the mayor, a director and a deputy director for the department....

*Sec. 7–1502. Powers*
Under the direction of the board, the department shall supply water, drainage and sewage services within and outside of the city.

The board shall periodically establish equitable rates to be paid:

1. By the owner or occupant of each house or building using water, drainage, or sewerage services; and

2. By any person, municipality, or public or private agency making a wholesale purchase of water, drainage or sewerage services from the city.

Unless otherwise provided by contract, the unpaid charges for water, drainage, and sewerage services, with interest, shall be a lien of the city upon the real property using or receiving them.

The board may make all necessary adjustments in the collection of water, drainage or sewerage charges.

The board may be given additional authority to establish rates by ordinance....

*Sec. 7–1503. Limitation on funds*
All monies paid into the city treasury from fees collected for water, drainage or sewerage services shall be used exclusively for the payment of expenses incurred in the provision of these services, including the interest or principal of any obligations issued to finance the water supply and sewage disposal facilities of the city, and shall be kept in separate funds.
* City Code references—Water, § 56–2–1 et seq.; sewers and drains, § 56–3–1 et seq.

State law reference—Authority to establish and maintain water and sewage systems, M.C.L. § 117.4f, M.S.A. § 5.2079.

and computer systems. It specifies that Bailey would "be the single point of responsibility for the Project" and would "assume full integration and overall coordination responsibility including complete supply, site work, and supporting services."[3]

In late 1992, the parties began to disagree whether Bailey had the contractual obligation to perform certain (expensive) duties. Bailey claims that the City breached its promise to provide accurate drawings and blueprints of the project that the City had allegedly paid Westin to provide. The City reads the contract language more broadly, maintaining that it was Bailey's responsibility to do these costly drawings and design.

Westin's role in the performance of PC-665 is also a matter of dispute. While the parties agree that Westin was a consultant to the City in the formation of the PC-665 contract, Bailey alleges that Westin's role was broader than that of an engineering consultant and that it acted as the City's agent. It claims that it lowered its original bid for the project on the representation of the City and Westin that the City, through Westin, would provide accurate designs and drawings for the work that PC-665 covered. Bailey asserts that this representation was a trap and that neither Westin nor the City intended to provide accurate designs and drawings. According to Bailey, both Westin and the City knew that the drawings they supposedly intended to submit were flawed.

Both Westin and the City deny these allegations and contend that PC-665 was intended to be a so-called "design and build" contract that required Bailey to do the work that Bailey now claims was the responsibility of Westin.

A central person in this dispute between Bailey and the City and Westin is Thomas J. DeRiemaker, who was employed by the City as its General Superintendent of Engineering. In that capacity, DeRiemaker was responsible for certifying the completion of work required by the contract and approving so-called "change orders" or diversions from the work specified in the contract. Bailey

claims that DeRiemaker acted in bad faith while performing these duties and described his conduct as "gross negligence ... in reckless and wanton disregard of Bailey's rights."[4] The City disputes this and contends that DeRiemaker's performance of his contract duties is governed by the terms of the contract and is, in any event, not tortious.

These disputes led to other difficulties and the work on the contract stopped. The parties attempted to resolve their differences. The attempt failed.

Bailey filed this suit in February 1996. The original twelve-count complaint contained allegations of breach of contract and common law tort claims for fraud, fraudulent inducement of contract, conspiracy to commit fraud, negligent misrepresentation, tortious interference with contractual relations, negligence and gross negligence.

About two weeks after Bailey filed its suit, the City, acting through the DWSD Board of Commissioners, declared Bailey in default of PC-665. This decision was upheld by the City Council less than four months later. Before the City Council acted, however, City employees removed property that Bailey had stored in its locked facilities located on DWSD sites. Bailey alleges that defendants Gorden and Qaqish "exercised improper dominion" over this property.[5]

Bailey then moved to amend its original complaint to include this and other conduct on the part of defendants occurring in the months after it had filed suit. The proposed amended complaint added constitutional tort claims, but left virtually unchanged the common law tort claims.

On March 27, 1997, I issued an order that allowed plaintiff to amend its complaint in part. I reserved judgment on the proposed amendments that would have either kept the original common law tort counts or added new ones. As the order stated, my reason for doing so was to determine, after providing the parties with an opportunity to present evidence on the issue, whether the doc-

---

3. PC-665, Sec. 1.01, ¶ 2.

4. Amended Complaint, ¶ 179.

5. *See* Amended Complaint at ¶ 243.

trine of governmental immunity foreclosed the common law tort allegations against defendants.

## IV. *Bailey's Offer of Proof*

Since the defendants have filed Rule 12(b)(6) motions to dismiss Bailey's common law tort claims which allege fraudulent inducement, negligent misrepresentation, conspiracy to commit fraud, negligent misrepresentation, tortious interference with contractual relations, negligence and gross negligence, I now consider the proposed evidence submitted by Bailey in its responses to the motions. I assume the truth of this proposed evidence in deciding the motion. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

To support its argument that the City may not claim governmental immunity from tortious acts, Bailey presents evidence in the form of expert witness testimony and affidavits. Its principal expert is Geoffrey H. Osborne ("Osborne"). Osborne's opinion is that because the City's department (DWSD) maintains its books and establishes its rates in a manner similar to that of privately-owned investor utilities, and that because DWSD has net income (except for 1991), i.e., that its revenues are greater than its expenses, the City therefore operates and intends to operate its water and sewer department as a proprietary enterprise.[6]

Bailey submits a record of the documentary evidence upon which it intends to rely, and it has collated this evidence in its closing brief. *See* Appendix A attached hereto.

It also submits a declaration of Dr. Gregg Jarrell, who describes how an expert would analyze the finances and operations of DWSD to determine whether DWSD operates its disposal funds primarily for the purpose of producing a pecuniary profit.

In deposition testimony referred to in the hearing on the motion, an exchange between the City's attorney, Richard McClear, and

Osborne illuminated the proposed evidence and the theory behind Bailey's assertion that the City is not entitled to governmental immunity:

Q: [McClear] Is it fair to say that you have told us today in your opinion that because Detroit, both its water fund and sewer fund does its financial reporting, prepares its financial statements in accordance with the GASB standard,[7] that it is a proprietary for-profit enterprise?

\* \* \* \* \* \*

A: Just because it reports its financial results that way, doesn't lead me to believe solely it is a for-profit entity. That in itself would not do it for me. What the elements are that lead me to my opinion that these are for-profit entities is a number of things.

Q: Okay.

A: They are that one: The city has determined to report these operations in a manner of enterprise funds which by reading the accounting literature, the auditing literature in and of itself has identified this is a different, segregated operation which runs itself and behaves like a for-profit entity. That's the first thing. That's very obvious. Number two and probably more important in my analysis is that upon looking at the historical results, operating results of these entities, both these funds have been very profitable. Profit defined as operating income which is in essence a measurement of how it runs its core business and is also the measurement in which you would compare this entity to a non-municipal entity. Investor-owned entity would be comparison at the operating line. It's able to manage its business, set its rates, collect its revenues, deal with its customers in a way that it can earn revenues in excess of its cost of doing business on operational business; that's very strong evidence to me, something I look to. Number three would be the way the opera-

---

6. The position of the City is that it operates its water and sewerage department as a governmental function.

7. GASB is an acronym for Government Accounting Standards Board. This body develops stan-

dards that the accounting profession should follow when working for governmental entities. These standards are revised and published from time to time and are widely accepted by accountants.

tion presents itself. I believe I read some quote by the director of DWSD they view their, they view their business as a for-profit orientation. They talk about their customers, they talk about their rate setting in a way that leads me to believe they run their business prudently like a for-profit entity. All these elements are there in my belief that they have set this organization up to be run in a way in which they are going to be earning operating income. They're not breaking even, not having losses continually but out to make profit at the operating income level.

Q: Is that it?

A: Lastly would be my experience in dealing with for-profit entities in the comparison of way this business operates to what is done in the private world of, private enterprise and how they operate. I think they operate much the same way as those entities do.[8]

The City responded to this by showing that DWSD's accounting methods were irrelevant to a determination of the City's statutory immunity and that, in any event, Osborne, a non-lawyer, was not qualified to testify as to the City's governmental immunity:

Q: [McClear] Are there any generally accepted accounting principles that would tell you what the city of Detroit's primary purpose is in providing supply of potable water, in providing waste water treatment services?

A: Generally accepted accounting principles would tell me something about their purpose?

Q: Primary purpose.

A: Well, clearly I think GAAP, is Generally Accepted Accounting Principles, which is G–A–A–P all caps, provides guidance as to the presentation of the results of that business and so therefore I do believe it does provide some insights as to the purpose, which is a profit making entity because it is presented significantly different than that of the normal operations of the city government. So I do think that there is some purpose of those funds that you could find in GAAP because of the way it's presented.

Q: But my question to you was: Is there any generally accepted accounting principle which tells you what Detroit's primary purpose is in supplying, providing a supply of potable water and providing waste water treatment services?

A: GAAP doesn't address what an intent of an operation is. It addresses the accounting presentation and financial statement presentation of those operations based on an intent or purpose.[9]

Osborne also stated that his opinion was limited to a determination whether DWSD operated and kept records in a manner similar to that of a for-profit/proprietary entity.[10] Osborne made it clear, however, that he was not qualified to render an opinion about vital legal issues under the governmental immunity statute:

A: [Osborne] Well, the issue I understand that's before us relates to a determination of whether or not the Water Department and Sewer Department are profit making entities and whether their past historical performance and operations demonstrate they in fact have been profit making entities, that they're operated that way and that they present themselves to the public that way in financial records. Really is to investigate those issues, whether they are a proprietary operation and therefore for profit. That would be my involvement with that issue.

\* \* \* \* \* \*

Q: [McClear] Would it be fair to say from your answer that if I asked you what the legal definition of a governmental function was under Michigan Law, you would have no opinion on that?

A: In essence you're asking me for a legal opinion. You just kind of answered your own question didn't you? I can't give you a legal opinion; I'm not a lawyer.[11]

8. Osborne deposition at 53–56.

9. Osborne deposition at 9–10.

10. Osborne deposition at 15–16.

11. Osborne deposition at 15–16.

Even though Osborne testified he was unable to offer an opinion on this important legal issue, he did say that DWSD operated in a manner similar to water and sewage companies that had privatized and operated for a profit.[12] From that he inferred that DWSD engaged in a proprietary function.

Bailey has also submitted documents, from raw financial data sheets to detailed financial statements prepared by its auditors and accountants and documents DWSD issued to prospective investors. See Appendix A. From these Bailey argues that according to accounting standards, copies of which it has also submitted, the documents establish that DWSD operates in a manner similar to for-profit/proprietary entities and, pursuant to those operations, made huge profits.

It also points to the method by which DWSD sets its rates to establish that DWSD is proprietary in nature. This so-called "utility basis" of ratemaking, according to Bailey, allows DWSD to charge its suburban customers a higher rate in order to subsidize the lower rates of city residents. Bailey reasons that this evidence make it

> abundantly clear that DWSD's purpose *in setting rates* is to maximize pecuniary profits by extracting higher rates from the largest portion, by far, of its customers base.[13]

(Emphasis added).

Section VII of Bailey's Closing Brief on the City's Governmental Immunity Defense [14] sets forth the "evidence" that Bailey would use to prove that "DWSD is operated with the primary purpose of producing a profit." It points out that between 1984 and 1996 the City averaged profits of about $22 million for a total of about $285 million. These profits, according to Bailey, result from an expanding base of suburban customers serviced by DWSD.

### V. *The City's Motion for Summary Judgment*

The City's motion for summary judgment is based on a state statute that flatly says,

"All governmental agencies shall be immune from tort liability in all cases wherein the governmental agency is engaged in the exercise or discharge of a governmental function...." M.C.L. § 691.1407(1).

The application of that statute to this case, the City argues, requires no discovery. According to the City, the statutory emphasis is on the exercise or discharge of a governmental function, not whether the governmental agency makes or does not make a profit from its operations. Bailey, the City argues, seeks to read into that language an interpretation that the immunity given to such governmental function is lost when the governmental function can be said to make a profit.

The City argues that the test is not whether a profit is made. The test, it says, is whether or not the function is governmental. It says that the Legislature stated explicitly what a governmental function is: "an activity which is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." MCL 691.1401(f). This means, says the City, that governmental function is not defined by its financial activity, but rather by the statute and charter under which it operates a water and sewage department.

Bailey claims that it has been denied essential discovery in this regard. It says that the discovery it seeks would prove that the governmental function in which the City engages through the Detroit Water and Sewerage Department is not a governmental function at all; that evidence should be permitted to be discovered to show that, even though the Detroit Water and Sewerage Department is an activity mandated by the City's Charter, that mandate can be finessed by a showing of a profit motive or intention.

The City, in turn, responds by stating that a second statute makes the point even more clear: M.C.L. § 691.1413, which states that, even if a governmental agency undertakes an activity primarily for profit, that activity still does not destroy governmental immunity if the activity is normally supported by fees or

---

**12.** Osborne deposition at 32.

**13.** Bailey's Closing Brief on the City's Governmental Immunity Defense at 22.

**14.** *Id.* at 12–15.

taxes. Accordingly, the City contends that the argument which Bailey makes, that it needs further discovery, is groundless; i.e., that profits or profit-making intentions are not relevant to the application of the liability statute in this case.

## VI. *Law*

### A. *The City's Motion*

Michigan's governmental liability statute provides in pertinent part that:

> all governmental agencies shall be immune from tort liability in all cases wherein the governmental agency is engaged in the exercise or discharge of a governmental function....

M.C.L. § 691.1407(1).

A key question in this provision is what constitutes a "governmental function." The Michigan Legislature provides a clear answer to that question when, in 1986, it adopted almost verbatim the definition crafted by the Michigan Supreme Court in its seminal decision, *Ross v. Consumers Power (On Reh)*, 420 Mich. 567, 363 N.W.2d 641 (1984). The governmental liability statute states:

> "Governmental function" is an activity which is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law. ·

M.C.L. § 691.1401(f). As noted by the Supreme Court, this definition is "broad and encompasses most of the activities undertaken by governmental agencies." *Id.* at 621, 363 N.W.2d 641.

While broad, the definition is not infinite. There are some activities that the definition does not cover. The Legislature has carved out exceptions to governmental immunity for matters such as the construction and maintenance of highways,[15] the operation of government vehicles,[16] and maintenance of public buildings.[17] Another is the "proprietary function" exception. This exception provides that governmental agencies do not receive immunity from property damage or bodily injury they cause while performing an activity for the primary purpose of producing a pecuniary profit, unless the activity is normally supported by fees or taxes. MCL 691.1413; *Hyde v. University of Michigan*, 426 Mich. 223, 393 N.W.2d 847 (1986).

Michigan courts, in reviewing the operations of DWSD and similar agencies in the state, have concluded that their "primary purpose" is to protect both the environment and the public health, not to produce a pecuniary profit.[18] An important case is *Beauchamp v. Saginaw Twp.*, 74 Mich.App. 44, 253 N.W.2d 355 (1977). There, the plaintiff was seriously injured during the construction of a sewer in an undeveloped portion of the defendant city. The Michigan Court of Appeals noted that, while other Michigan courts had in the past found that the construction of sewer systems was not a governmental function, "[t]oday, sewage systems are recognized as a necessary element for the health of the public in providing for disposal of waste and purification of water." *Id.* at 51, 253 N.W.2d 355. The court held that the construction of the sewage system involved in that case was done in the interests of public health, not so the city could engage in a proprietary "business enterprise" even though the city received a financial benefit from the construc-

---

15. *See* M.C.L. § 691.1402.

16. *See* M.C.L. § 691.1405.

17. *See* M.C.L. § 691.1406.

18. Evidence of this primary purpose can be found in Bailey's submissions. Two of Osborne's Affidavits (dated Sept. 18, 1996 and Dec. 17, 1996) concede that the City of Detroit Charter established DWSD "to supply water, drainage and sewage services within and outside the City under the administration of the Board of Water Commissioners." *See* Osborne Affidavits at Para.4. I note that Osborne does not say that the

Charter set up DWSD to make a pecuniary profit.

Bailey also proffered as Exhibit 2 to William Stannard's Deposition, dated April 22, 1997, the audit records of DWSD prepared by Arthur Andersen & Co., which state at page 9 that the "City of Detroit Charter established the Water and Sewerage Department ... to supply water, drainage and sewage services within and outside the City of Detroit...." This language, taken almost verbatim from the Charter itself, provides evidence that the City's intent in operating DWSD was the provision of enumerated services, not the production of pecuniary profit.

tion. *Id.* at 50–52, 253 N.W.2d 355.[19] The court cited well-established precedent that:

> The drainage of a city in the interests of public health is one of the most important purposes for which the police power can be exercised. *Detroit v. Village of Highland Park,* [186 Mich. 166, 152 N.W. 1002 (1915) ];
>
> citing *New Orleans Gaslight Co. v. Drainage Commission,* 197 U.S. 453, 25 S.Ct. 471, 49 L.Ed. 831 (1905).

74 Mich.App. at 51, 253 N.W.2d 355.

The City's governmental function does not change, as Bailey asserts, because a governmental agency operates in a manner similar to private, for-profit entities. As *Hyde, supra,* reasoned, the determination of whether a governmental activity fits within the "proprietary function" exception to governmental immunity does not turn on how the agency responsible for the function keeps its books:

> If the availability of immunity turned solely upon an examination of the ledgers and budgets of a particular activity, a fiscally responsible governmental agency would be "rewarded" with tort liability for its sound management decisions. Such a rule could discourage implementation of cost-efficient measures and encourage deficit spending. *Id.* at 258, 393 N.W.2d 847.

This may be one reason why "[t]he Legislature has defined 'proprietary function' in a very narrow, unambiguous manner." *Id.* at 260, 393 N.W.2d 847.

Bailey's proffer does not establish that the City operated within this "very narrow" exception. I have no reason to dispute Osborne's claim that he has done "significant work in the area of profitability assessment and analysis." [20] Similarly, nothing on the record leads me to doubt his statement that the "majority" of his "expert testimony has involved the calculation or analysis of profitability." [21] But, this inquiry into DWSD's profitability is not dispositive as to the legal issue, i.e., the City's status under the governmental liability statute in its operation of DWSD. Osborne conceded this when he said that there was much more involved in the "legal side in dealing with sovereign immunity that [he] would not have the expertise to deal with and [had] not been asked to deal with." [22] He also admitted that he did not even "study the legal issues" [23] and that he did not have the ability to deal with important legal issues:

> Q: [McClear] Would it be fair to say from your answer that if I asked you what the legal definition of a governmental function was under Michigan Law, you would have no opinion on that?
>
> A: [Osborne] In essence you're asking me for a legal opinion. You kind of answered your own question didn't you? I can't give you a legal opinion; I'm not a lawyer.[24]

In its essentials, Osborne's opinion is that from an accounting standpoint, DWSD operates similar to for-profit entities and, because of those operations, receives a profit. Even

---

19. See also *Davis v. City of Detroit,* 98 Mich.App. 705, 711, 296 N.W.2d 341 (1980) (Michigan Court of Appeals was "convinced" that the "primary purpose" of DWSD suburban project was to deal with disposal problems "while protecting the environment."); *Scott v. City of Detroit,* 107 Mich.App. 194, 309 N.W.2d 201 (1981) (The interests of public safety and pollution control mandated the coordinated suburban sewage disposal system. Therefore, DWSD engaged in governmental function, even though injuries happened outside of city limits.) Bailey asserts that these cases are inapplicable to the present case because the premises upon which they were decided "simply no longer obtain." *See* Bailey Closing Brief at 9.

Bailey reasons that, because DWSD has supposedly changed its methods of accounting and ratemaking since *Davis,* the present case is distinguishable. Bailey has not, however, shown why the distinctions matter. In order to con-

clude that *Davis* is inapplicable to the present set of facts, I would have to find that DWSD's primary purpose for operation changed merely because the law changed to require the adoption of new accounting and ratemaking methods. I fail to see a connection. Both public and private organizations regularly implement accounting changes. They also change the manner in which they set prices. These changes do not automatically alter the organization's "primary purpose."

20. Closing Affidavit of Geoffrey Osborne at ¶ 2.

21. *Id.*

22. Osborne deposition at 16.

23. Osborne deposition at 19.

24. Osborne deposition at 16.

if I accepted Osborne's conclusions that DWSD operated like a for-profit enterprise, realized profits and held itself out to the outside world as a for-profit enterprise, Bailey cannot infer from these conclusions that profit is, as the statute requires, DWSD's "primary purpose."

The Michigan cases clearly teach that the existence of a profit is only a factor in the determination of a governmental agency's intent. *Hyde*, 426 Mich. at 258, 393 N.W.2d 847. If it were otherwise, a governmental entity operating in a businesslike manner, and realizing a surplus, would risk the loss of its immunity.

The language in the statute requires an examination of the entity's "primary purpose." Osborne conceded that an agency's "primary purpose" cannot be directly discerned by simply looking at the manner in which an entity does its accounting and that accounting principles do not "address the intent of an operation."[25] Accounting principles, according to Osborne, only "provide . . . guidance as to the presentation of the *results* of [a] business."[26] (Emphasis added.) They only state the obvious: that the "results" of a business are something entirely different from the "intent" behind the operation of that business.

I conclude that Bailey has not demonstrated that the case law, beginning with *Beauchamp, supra*, is inapplicable to the case before me merely because DWSD allegedly keeps its books and sets its rates differently than it did twenty years ago. To conclude otherwise, I would have to make the unsupportable finding that when DWSD adopted new, but legally mandated, accounting and ratemaking methods, its primary purpose suddenly went from protecting the environment and the public health to making a pecuniary profit for itself.

Bailey quotes language in *City of Novi v. City of Detroit*, 433 Mich. 414, 420, 446 N.W.2d 118, 121 (1989), that "[t]he fundamental purpose of a 'utility basis' method [of ratemaking] is to compensate the proprietary interest in a public utility with a reasonable rate of return from nonowner, nonresident customers, commensurate with the value of the facilities required to provide services to these customers." But, that language only deals with the fundamental purpose behind DWSD's current ratemaking methods, not, as the statute clearly requires, DWSD's fundamental purpose for operation.

Bailey submits financial reports, accounting data and proffers the declaration of another expert to show that DWSD is run for a profit. Assuming its truth, again, all that can be said after reviewing Bailey's additional submissions is that the City at times makes a profit. The statute requires more.

Bailey also maintains that DWSD's operations are not funded by "fees" because the plain meaning of "fees" does not encompass payment for tangible goods like water. "Fees," according to Bailey, only include compensation for services.[27] But, Bailey has not pointed to a single case to support its view.

There is a good reason for this omission. The Michigan Supreme Court has included in the definition of "fee" the payment for tangible goods. As *Hyde, supra*, pointed out, agencies are often "required by statute or other laws to charge a fee for [their] goods and services." *Hyde*, 426 Mich. at 260, 393 N.W.2d 847.

The Michigan Supreme Court's interpretation of the term "fee" is not uncommon. The drafters of the charter provision that created DWSD used the definition in such a way when they directed that "[a]ll moneys paid into the city treasury from *fees* collected for *water, drainage or sewerage services* shall be used exclusively for the payment of expenses incurred in the provision of these services, including the interest or principal of any obligations issued to finance the water supply and sewage disposal facilities of the city, and shall be kept in separate funds." (Emphasis added). Charter, Chapter 15, § 7–1502.

---

25. Osborne deposition at 9–10.

26. *Id.*

27. This is a curious argument since the money that DWSD customers pay the City compensates it for vital services such as the drainage, transportation, and treatment of wastewater.

In my view, DWSD's operations fit squarely within the definition of "governmental function" because they are clearly activities which are expressly "authorized by constitution, statute and local ordinance." M.C.L. § 691.1401(f). The Michigan Constitution of 1963, art. 7, sec. 24 provides in pertinent part that:

> Subject to this constitution, any city or village may acquire, own, operate, within or without its corporate limits, public service facilities for supplying water, light, heat, power, sewage disposal and transportation to the municipality and the inhabitants thereof.

#### Service outside corporate limits

> Any city or village may sell and deliver water and provide sewage disposal services outside of its corporate limits in such an amount as may be determined by the legislative body of the city or village....

The Home Rule Cities Act, M.C.L. § 117.1 *et seq.*, provides similar authorization at M.C.L. § 117.4f(3) and (4) as does Section 7–1502 of Chapter 15 of the Charter of the City of Detroit. The provision makes it clear that DWSD, under the direction of the Board of Water Commissioners, "shall supply water, drainage and sewerage services *within and outside* of the city." (Emphasis added).

 In sum, the City is entitled to governmental immunity for two reasons:

1. DWSD engages in a governmental function whenever it provides water and sewage services because the Michigan Constitution, Home Rule Cities Act, and Detroit City Charter authorize such activity.

2. DWSD does not engage in a proprietary governmental function when it supplies water and sewage services because a) DWSD's primary purpose for operation is to protect the environment and the general public, not to produce a pecuniary profit and b) DWSD's activities are "normally supported" by fees.

A contrary conclusion would ignore the way in which DWSD operates by improperly focusing on abstract principles of accounting and ratemaking.

I conclude that the City is immune from common law tort liability as set forth herein. Pursuant to Fed.R.Civ.P. 12(b)(6) and for those amended common law tort counts that would be futile to allow for the reasons stated above, the City is entitled to dismissal of the following counts: Counts V, VI, XIII, XVI of proposed Amended Complaint; Counts III, IV, IX of the original Complaint. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

### B. *The DeRiemaker Motion*

With regard to defendant DeRiemaker, Michigan's governmental liability statute, M.C.L. § 691.1407(2), provides in pertinent part that:

> (2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency shall be immune from tort liability for injuries to persons or damages to property caused by the officer, employee, or member while in the course of employment or service or volunteer while acting on behalf of a governmental agency if all of the following are met:
>
> (a) The officer, employee, member or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.
>
> (3) Subsection (2) shall not be construed as altering the law of intentional torts as it existed prior to the effective date of subsection (2).

This statutory language would favor Bailey's position if it is shown that DeRiemaker's alleged actions are more than just negligent (i.e., grossly negligent, reckless or intentional). *Larkins v. Mental Health Department*, 137 Mich.App. 318, 358 N.W.2d 7 (1984), held that "negligence is not transformed into an intentional tort merely by alleging that defendant's activity was intentional, wilful or wanton."

Dismissal of these tort claims against DeRiemaker may presently be inappropriate. At some point, a Rule 56 summary judgment motion may be proper. I add the following comment: If the common law tort claims, which are framed as intentional, survive summary judgment, at trial a jury instruction would have to be given to require not only a finding of intentional or reckless conduct on DeRiemaker's part but also that his conduct was outside the scope of his authority.

### C. *Motions as to Gorden and Qaqish*

█ Gorden and Qaqish, both employees of DWSD, are accused of conversion in connection with the alleged break-ins of Bailey offices and the seizure of Bailey's property. This conduct, if proven, may constitute an intentional tort. *See Lawrence v. Department of Corrections*, 81 Mich.App. 234, 265 N.W.2d 104 (1978). Because the statute does not immunize individual state actors such as Gorden and Qaqish for their intentional torts, governmental immunity cannot at this stage of the case lead to the dismissal of these claims against Qaqish and Gorden.[28]

This result is not changed by their assertions that their entering the Bailey offices and taking its property was permitted by the contract. It is premature to determine, as a matter of law, if this is a proper interpretation of the contract.

### D. *Westin's Motion*

Michigan's governmental liability statute may also not apply to defendant Westin. Facially it would seem that private compa-nies are not entitled to governmental immunity because they have a contractual relationship with a governmental agency. *See Jackson v. New Center Community Mental Health Services*, 158 Mich.App. 25, 404 N.W.2d 688 (1987).

I note that in its Complaint, Bailey refers to Westin as the City's agent. That status might provide immunity. Further discovery as to this point may be in order and, thus, any decision at this time under Fed.R.Civ. P.12(b)(6) is premature.

IT IS SO ORDERED.

An appropriate order may be submitted.

### *APPENDIX A*

### *EVIDENCE OF RECORD*

1. Transcript of Deposition of Geoffrey H. Osborne (April 23, 1997) and exhibits thereto as filed with the Court:

a. Osborne Exhibit 1—Affidavit of Geoffrey H. Osborne and exhibits thereto (December 17, 1996)

b. Osborne Exhibit 2—Affidavit of Geoffrey H. Osborne and exhibits thereto (September 18, 1996)

c. Osborne Exhibit 4—DWSD Proprietary Fund Binder and exhibits thereto:

 (1) Affidavit of Geoffrey H. Osborne and exhibits thereto (September 18, 1996)

 (2) Affidavit of Geoffrey H. Osborne and exhibits thereto (December 17, 1996)

 (3) Sewage Disposal Fund Historical Financial Summary

 (4) Water Fund Historical Financial Summary

 (5) Sewage Disposal Fund Financial Statements

 (6) Water Fund Financial Statements

---

**28.** MCL 691.1407(3) states that the immunity provided in M.C.L. § 691.1407(2) to individual state actors "shall not be construed as altering the law of intentional torts as it existed prior to the effective date of" M.C.L. § 691.1407(2). No-tice that this "intentional tort" exception does not apply to governmental units which are immunized by M.C.L. § 691.1407(1), but rather only to individual government actors.

(7) Excerpts from *Governmental Accounting and Financial Reporting Standards*

(8) *Audit and Accounting Guide: Audits of State and Local Governments*

(9) Coopers & Lybrand Summary: Privatization of U.S. Water Systems

d. Osborne Exhibit 5—Chart: Operating Income Over Time

e. Osborne Exhibit 6—Chart: Revenue versus Expenses for Sewage Disposal Fund

f. Osborne Exhibit 7—Chart: Revenue versus Expenses for Water Fund

g. Osborne Exhibit 8—Excerpt from *Audit and Accounting Guide: Audits of State and Local Governments*

h. Osborne Exhibit 9—Excerpts from *Governmental Accounting and Financial Reporting Standards*

i. Osborne Exhibit 10—Excerpts from *Governmental Accounting and Financial Reporting Standards*

2. Transcript of Deposition of William Stannard (April 23, 1997) and exhibits thereto as filed with the Court:

a. Stannard Exhibit 1—Curriculum Vitae of William G. Stannard

b. Stannard Exhibit 2—City of Detroit Sewage Disposal Fund Financial Statements for the years ended June 30, 1991 and 1990

c. Stannard Exhibit 3—Detroit City Council Public Hearing on Fiscal Year 1995–96 Proposed Water and Sewerage System Budgets and Rate

d. Stannard Exhibit 4—Detroit City Council Public Hearing on Fiscal Year 1996–97 Proposed Water and Sewerage System Budgets and Rate

e. Stannard Exhibit A—Article from The Columbus Dispatch, dated March 22, 1996

f. Stannard Exhibit B—City of Detroit Water Fund Financial Statements for the years ended June 30, 1994 and 1995

g. Stannard Exhibit C—Affidavit of Geoffrey H. Osborne (December 17, 1996)

h. Stannard Exhibit D—City of Detroit Water and Sewerage Department Fiscal Year 1994–95 Water Rates

3. City of Detroit, Michigan Comprehensive Annual Financial Report Year Ended June 30, 1995 (referred to as Plaintiff's Exhibit 2 at May 2, 1997 hearing and attached to Bailey's Closing Brief)

4. City of Detroit, Michigan Comprehensive Annual Financial Report Year Ended June 30, 1996 (attached to Bailey's Closing Brief)

5. Declaration of Gregg A. Jarrell, dated April 31, 1997, and attached curriculum vitae (filed with the Court and attached to Bailey's Closing Brief)

6. Declaration of Gregg A. Jarrell, dated September 11, 1997, and attached curriculum vitae (attached to Bailey's Closing Brief)

7. Closing Affidavit of Geoffrey H. Osborne, dated June 2, 1997 and all exhibits thereto.

8. Rule 56 Affidavit of Aaron C.F. Finkbiner, III