**UNITED STATES of America, Plaintiff and Counter–Defendant,**

v.

**State of MICHIGAN, Defendant and Cross–Plaintiff And Cross–Defendant,**

v.

**City of Detroit, a municipal corporation, and Detroit Water and Sewerage Department, Defendant and Cross–Plaintiff,**

v.

**All Communities and Agencies Under Contract with the City of Detroit for Sewage Treatment Services, et al.**

No. CIVA 77–71100.

United States District Court, E.D. Michigan, Southern Division.

March 23, 2007.

Jon M. Lipshultz, U.S. Department of Justice, Environment & Natural Resources Div., Washington, DC, Peter A. Caplan, United States Attorney's Office, Detroit, MI, Beth S. Gotthelf, Butzel Long, Bloomfield Hills, MI, for Plaintiff Counsel.

Marilyn A. Peters, Dykema Gossett, Bloomfield Hills, MI, Mark D. Jacobs, Dykema Gossett, Robert C. Walter, Detroit City Corporation Counsel, Avery K. Williams, Detroit, MI, Pamela J. Stevenson, Michigan Dept of Attorney General, Lansing, MI, James A. Smith, R. Craig Hupp, Bodman, Longley, Detroit, MI, William W. Misterovich, Mt. Clemens, MI, James E. Tamm, O'Connor, DeGrazia, Robert A. Marzano, Plunkett & Cooney, Bloomfield Hills, MI, Timothy L. Cronin, Hemming, Polaczyk, Plymouth, MI, Beth S. Gotthelf, David W. Potts, Miles T. Macik, G. Christopher Bernard, Kurt M. Brauer, Butzel Long, Bloomfield Hills, MI, Charles E. Barbieri, Foster, Swift, Lansing, MI, Charles E. Lowe, Lowe, Lewandowski, Plymouth, MI, David S. Steingold, David S. Steingold Assoc., John H. Fildew,

Charles S. Kennedy, III, Fildew Hinks, Detroit, MI, Patrick B. McCauley, Sommers, Schwartz, Southfield, MI, Barry A. Seifman, Seifman & Associates, Farmington Hills, MI, Stuart Trager, Salamey Assoc., Dearborn, MI, Annette M. Lang, U.S. Department of Justice, Environmental Enforcement Section, Washington, DC, for Defendant Counsel.

## OPINION AND ORDER DENYING ON INTERCEPTOR REPAIR COST DISPUTE

FEIKENS, District Judge.

In August 2004, an interceptor under 15 Mile Road in Sterling Heights collapsed, and the parties in this case dispute the allocation of the repair costs. DWSD used bond proceeds to finance the $53 million of repairs and allocated the $3 million annual amortization entirely to Macomb County. Macomb claims that Detroit alone or the overall DWSD system should bear the repair costs. Wayne and Oakland Counties oppose Macomb's request to spread any costs system-wide, suggesting that costs should be borne by Macomb and/or Detroit. For the reasons below, I find Macomb's claims either fail legally or have been waived by failure to raise this issue in the process laid out in the Second Amended Consent Judgment.

## ANALYSIS

Macomb County brings five counts: (1) breach of the contract between DWSD and Macomb; (2) violation of due process; (3) violation of the "rule of prudent investment"; (4) negligence; and (5) charging Macomb for the 2004 collapse is arbitrary and capricious.[1] I will discuss each in turn.

### 1. Breach of Contract

█ The 1967 DWSD–Macomb contract provides that DWSD is responsible for the construction, operation, and maintenance of wastewater disposal facilities. (Macomb's Br. at Ex. 1, ¶ 21.) Macomb alleges that DWSD breached the contract by neglecting to inspect and maintain the Sterling Heights interceptor, despite warnings from the Army Corps of Engineers and the Jenny Engineering Corp. that future collapses were imminent. (Macomb's Br. at 6.)

The difficulty Macomb has pursuing this argument is that the Second Amended Consent Judgment created a process to head off these disputes, in which Macomb was required to participate. One of the key projects in the Consent Judgment requires "asset audit" processes in 2001 and 2004. The "asset audit" of "major wastewater treatment[,] transportation and pumping facilities throughout the DWSD system" was intended to assess "the current and projected operational status of all significant system components, their state of repair condition, and their projected major maintenance and replacement status." (S.A.C.J.IV.B.1.) Among other tasks, DWSD and Wayne, Oakland, and Macomb Counties were all required to determine the scope of those audits and oversee the work. (Id.) This provision of the Consent Judgment was intended to prevent exactly this kind of dispute, by giving the three suburban counties a chance to participate in a determination of the condition and maintenance of assets serving them.

Therefore, twice in recent years, Macomb had the opportunity to mandate that DWSD physically inspect the interceptor or argue for a different maintenance

---

1. Macomb's sixth count merely restates counts one and three. I cannot discern a basis for this count independent of Macomb's prior counts.

schedule. According to the minutes of meeting which all parties received, on October 21, 2004, a report on the more recent asset audit was made. (DWSD/First Tier Customer Partnering Group Minutes, Oct. 21, 2004, 3.) Although Macomb had a representative in attendance, there is no record that Macomb ever requested a physical inspection of the interceptor or even a more thorough examination of the maintenance schedule, despite the fact that the asset audit did not include a physical inspection of the interceptor. (*Id.* at Appendix 1; 2004 Triennial Asset Audit.) It also appears that there was information provided as to the audit on May 4, 2004, without questions arising.

Macomb was given similar opportunities in 2001. Macomb and other customers received letters on which they were copied noting DWSD was soliciting guidance on the 2001 asset audit from its customers and seeking input from them as to what the recommendations of the asset should be. (Letter from Gary Fujita to Seidel and Blakeslee, November 9, 2001.) At a meeting held September 11, 2001 at 10 a.m., the status of the asset audit was presented, and though Wayne County attended and asked questions, there is no record that representatives of Macomb County chose to attend (though they are listed as members of the group that was meeting) or otherwise fulfilled its duties to provide guidance on the audit. (DWSD/First Tier Customer Partnering Group Steering Committee Minutes, Sept. 11, 2001.) At a meeting attended by a Macomb County representative on May 18, 2001, the asset audit was also discussed, and a list of tasks that would be part of that asset were distributed. (DWSD/First Tier Customer Partnering Group Steering Committee Minutes, May 18, 2001.)

In short, Macomb County had repeated opportunities in 2001 and again in 2004 to request a physical inspection of the inter-ceptor, or a more thorough review of a change in maintenance of that interceptor. At each and every opportunity, it chose not to do so, despite being charged by the Second Amended Consent Judgment to participate in the determination of the scope of the work and help oversee the work itself. Its repeated failure to request what it now claims it was negligence for DWSD not to do, despite a responsibility to state the scope of activities, cannot be overlooked. These facts overwhelming lead me to the legal conclusion that Macomb has waived any opportunity to benefit from a claim of breach of contract for failure to inspect or maintain the interceptor. Therefore, I reject this argument.

### 2. Due Process Violation

■ Macomb argues that it should not have to pay for the repairs because DWSD policy dictates that such costs should be spread system-wide. Macomb's only support for this contention is the minutes from a February 1980 Water Board meeting, which read in relevant part:

> It is the sense of the Board of Water Commissioners in regard to all extraordinary costs incurred in connection with facilities such as sewer mains, water mains, intake facilities and the sewage treatment plant, owned by the Department of Water and Sewerage and the Board of Water Commissioners, that, in the interest of fostering general good will among all users, those extraordinary costs be borne by the users of the entire system on an equal basis without reference to where a problem might have occurred; and further, that the administration of the DWSD be instructed to develop a comprehensive statement of that policy and suggest a plan as soon as possible for implementing it with respect to insurance or otherwise. Carried unanimously.

(Feb. 6, 1980 Water Board Meeting Minutes at 11.) Detroit argues that the 1980 Board minutes do not reflect the adoption of a binding policy of equal repair cost apportionment. (Detroit's Br. at 13.)

The above-quoted language is the only evidence presented by Macomb that a policy of system-wide cost allocation was adopted. Macomb has not produced any written document putting that policy into effect, and the policy is not reiterated in any other documents filed with this Court. The policy is not referenced by either the 1980 or the 1982 Rate Settlement Agreements, which were adopted within two years of the alleged policy's inception at the February 1980 Water Board meeting, and were signed by Smith on behalf of Macomb.

Moreover, the 1980 and 1982 Rate Settlement Agreements adopt a method of repair cost allocation contrary to what the "policy" provided. The 1980 Agreement, approved only six months after the policy was discussed at the Water Board meeting, made Macomb liable for a large portion of repair costs related to the Hayes–15 Mile Road interceptor collapse. (1980 Agmt. at 3–7.) Under the 1982 Agreement, Wayne County's share of repair costs from the Edison Corridor interceptor collapse was reduced by 60% because that interceptor did not serve Wayne County. (1982 Agmt. at 7; Macomb's Fund Br. at 6.) Neither Agreement adhered to the Board's alleged policy of equal cost apportionment, yet all parties approved those Agreements with no objection, which would be remarkable if they contradicted a "policy" in place at the time.

Based on the almost total lack of evidence such a policy was ever implemented, in the face of several documents that do not follow the supposed policy that were developed in the immediate aftermath of its supposed adoption, I find insufficient evidence that this was or is a policy, and thus, find this claim must fail.

### 3. *Violation of the Rule of Prudent Investment*

██ The "rule of prudent investment" permits a utility to recover from its customers the cost of prudent investments made, regardless of whether those investments proved to be necessary in hindsight. *ABATE v. Pub. Serv. Comm'n*, 208 Mich. App. 248, 257, 527 N.W.2d 533 (1994) (citing *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 309, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989)). Macomb argues that because DWSD was imprudent in neglecting to inspect and maintain the Sterling Heights interceptor, DWSD cannot recover from its customers the repair costs of the 2004 collapse. Macomb claims that DWSD should have foreseen the collapse after inspection reports were issued by the Army Corps of Engineers in 1980 and Jenny Engineering Corp. in 1981.

Macomb's argument is without merit. I have found no cases in the Sixth Circuit or Michigan state courts that say the "rule of prudent investment" is binding on a utility company. The Michigan Public Service Commission has applied the rule in deciding whether utility rates are reasonable, but the Michigan Court of Appeals emphasized that the rule is one of several methods the Commission may use. *ABATE*, 208 Mich.App. at 258, 527 N.W.2d 533. Additionally, the few Michigan cases to discuss the rule involve utility companies owned by private investors, not municipally-owned utilities like DWSD. The rule's aim is to ensure that investors receive a reasonable rate of return while utility customers pay a fair price. *See id.* at 267, 527 N.W.2d 533. Thus, it is illogical to apply the rule to a municipal entity such as DWSD, which has no private investors.

**570**

#### 4. Negligence

■ Macomb argues that DWSD was negligent in failing to repair the Sterling Heights interceptor after reports by the Army Corps of Engineers and Jenny Engineering Co. warned that a collapse was imminent. (Macomb's Br. at 13.) I have previously held DWSD's activities fit squarely within the definition of a governmental function. *Elsag Bailey, Inc. v. City of Detroit,* 975 F.Supp. 981, 990 (E.D.Mich.1997). Thus, DWSD is immune from tort liability under Michigan's governmental immunity statute, and Macomb's negligence claim is without merit. *See* M.C.L. 691.1407.

#### 5. Allocation of Repair Costs to Macomb is Arbitrary and Capricious

■ Based on its first four counts, Macomb alleges that imposing a charge on Macomb for the Sterling Heights collapse is unreasonable, arbitrary, and capricious. However, for the reasons listed above, Macomb has waived this argument by failing to raise the issue of inspection during the process laid out in the Consent Judgment for resolving infrastructure issues.

#### CONCLUSION

All of Macomb's claims for altering the current rate allocation are either legally flawed or were waived by Macomb's failure to raise them in 2001 or 2004 despite its duty to oversee the asset audit process set forth in the Second Amended Consent Decree. Therefore, I DENY Macomb's motion.

**IT IS SO ORDERED.**